UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA WALSH & DANIEL WALSH, ) <br> Administrators of the Estate of JASON WALSH, ) <br> deceased, and LAURA WALSH & DANIEL ) <br> WALSH, in their own right ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MICHAEL G. CHEZ, M.D., and ) <br> AUTISM AND EPILEPSY SPECIALTY ) <br> SERVICES OF ILLINOIS, ) <br> ) <br> Defendants. ) | Case No. 06 C 4958 <br><br> Judge Joan B. Gottschall |

**MEMORANDUM ORDER AND OPINION**

Plaintiffs Laura Walsh and Daniel Walsh, on their own behalf and as the administrators of the estate of Jason Walsh (collectively, "the Walshes") filed a motion pursuant to Rule 59(e) asking the court to vacate or reconsider its dismissal order of December 4, 2007 and grant leave to supplement their Rule 26(a)(2) disclosures. For the reasons stated below, the court denies plaintiffs' motion.

**I. BACKGROUND**

The Walshes' five-year old son, Jason, was treated by Dr. Michael G. Chez for autism. After suffering through numerous medical complications, he died in May 2003. The Walshes sued Dr. Chez and the Autism and Epilepsy Specialty Services of Illinois (collectively, "Chez") alleging medical malpractice. Their theory of liability was that Chez was liable for deviating from the standard of care "[i]n prescribing an abrupt wean from daily high-dose steroids to a

1

twice-a-week pulse-dose, a schedule not recognized or accepted within the pediatric community." Compl. ¶ 24(h).

As the case neared trial, the parties presented the court with numerous motions in limine. One of these was Chez's Motion in Limine No. 10,[1] which asked the court to bar the Walshes' experts from testifying, in part, because they failed to identify a standard of care. After the court had considered briefs, supplemental reports, and oral argument, it granted Chez's motion to exclude the Walshes' experts. The court then dismissed the case because the Walshes could not make a *prima facie* case without that testimony.

Two days later, the Walshes filed a motion for reconsideration and to vacate the December 4, 2007 order. In their reply brief, the Walshes clarified that the motion was filed pursuant to Rule 59(e) and the court will construe it as such.

## II. ANALYSIS

In their Rule 59(e) motion, the Walshes argue that: (1) they should be allowed to file supplemental expert reports as "new evidence" because the court did not inform them that their existing reports and supplements were insufficient; and (2) the court made a manifest error in law when it granted the defendants' motion in limine.[2]

---

[1]Docket No. 112. The court's order of December 4, 2007 incorrectly stated the motion was Docket No. 100 (which is actually *plaintiffs'* motion in limine no. 10). Chez cites throughout his briefs to docket number 86, which is also incorrect.

[2]In their reply brief, the Walshes spend considerable time (and attach multiple documents) to show that their experts are qualified to testify on causation. Without getting into the propriety of raising new matter in a reply brief, the court clarifies that it is not addressing the issue of causation because the dismissal was based on the Walshes' failure to provide expert opinions on the standard of care.

### A. Legal Standard - Rule 59(e)

Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "The decision whether to grant or deny a Rule 59(e) motion is entrusted to the sound judgment of the district court . . . ." *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996) (internal citations omitted). The grounds for a Rule 59 motion are extremely limited; in fact, "there are only three[:] newly-discovered evidence, an intervening change in the law, and manifest error in law."[3] *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998) (internal citations omitted). The moving party must "clearly establish" one of the grounds for relief. *See Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006) (quoting *Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1122 n.3 (7th Cir. 2001) (contrasting Rule 59 with Rule 60 and observing that the former has a lower threshold of proof but the latter allows for additional grounds for relief)).

### B. Arguments

The Walshes do not argue that there has been an intervening change in the law; therefore, the court need only address two of the grounds that justify a Rule 59(e) motion: (1) newly-discovered evidence; and (2) manifest error in law.

---

[3]Both parties claim that "manifest injustice" is a ground for granting a Rule 59(e) motion. Some district courts do include "manifest injustice" as a basis, typically citing hornbooks or other district courts for the proposition. *See, e.g.*, *C.H. Robinson Worldwide, Inc. v. Nat'l Prods.*, 01 C 6348, 2002 WL 99735, at *1 (N.D. Ill. Jan. 25, 2002) (stating the grounds for relief are as "(1) an intervening change in controlling law; (2) new evidence that has become available; and (3) clear error and manifest injustice")); *Bd. of Educ. of Arlington Heights Sch. Dist. No. 25 v. Ill. State Bd. of Educ.*, 98 C 5370, at *1 (N.D. Ill. Aug. 27, 2001) (citing *McMurray v. Harwood*, 870 F. Supp. 917, 920 (W.D. Wisc. 1994)). However, research uncovered no binding authority indicating that the Seventh Circuit has accepted "manifest injustice" as a ground for relief under Rule 59(e). The court therefore declines to add it.

3

### 1. The Walshes Produced No Newly-Discovered Evidence

The Walshes do not argue that they have discovered new evidence in its normal sense. Rather, they ask the court to treat their post-judgment expert reports as "new evidence," because they were unaware that the previously-submitted expert reports and supplements were insufficient prior to dismissal of the case. *See* Pls.' Reply in Supp. of Mot. for Reconsideration ¶ 14 ("The first time plaintiffs were made aware that the Court believed their supplemental reports were insufficient was on December 3, 2007. This Court's refusal to allow Plaintiffs to address the perceived deficiencies is an abuse of discretion.").

The Walshes' argument cannot prevail. The Walshes had ample warning and notice that the question of an appropriate standard of care was crucial to their *prima facie* case. To begin with, Chez filed his motion in limine to bar the Walshes' expert testimony on July 13, 2007, more than four months before the court dismissed the case. One of Chez's arguments was that the Walshes' experts fail to identify the baseline standard of care. *See* Defs.' Mot. in Limine No. 10 at 3-4. The Walshes had an opportunity to respond to that motion in writing, which they did. They had a further opportunity to respond orally at the August 8, 2007 pretrial conference, which they also did. At the pretrial conference, the parties discussed the motion at length. *See* Tr. of Proceedings - Pretrial Conference at 43:19-58:5, attached as Ex. E to Defs.' Reply Mem. in Supp. of Their Mot. to Strike Pls.' First Set of Supplemental FRCP 26(a)(2) Disclosures. The court specifically requested supplemental reports that identified the baseline standard of care. *See id.* at 63:24-64:1 (The Court: "So we're talking about the standard of care and expertise. When are we going to have reports, if any, that indicate those two things?"). The court clearly warned the Walshes that failing to provide such an opinion could be fatal to the case. *See id.* at

53:17-20 (The Court: "I think the ball is in [the Walshes'] court at this point. I'm not going to throw the case out today, I'm going to see what you can come up with, but I think without [the opinion] we're not going anywhere."). Over defendants' strenuous objections that the time for expert disclosures had long passed, the court granted the Walshes leave to file supplemental expert reports to address the identified deficiencies, and then granted extensions of time in which to file those reports. After the Walshes again filed deficient reports, the court ordered oral argument. On December 3, 2007, following oral argument, the court denied the Walshes request to file further supplemental reports and granted Chez's motion.

The Walshes had multiple opportunities to provide a sufficient expert report before the court dismissed the case and were advised of the deficiencies in their previous filings. Indeed, were they ever in doubt as to what was required (and the law is clear, so no doubt can be justified), the court at the pretrial conference overruled defendants' legitimate objections to give the Walshes one last chance to make their case. A Rule 59(e) motion does not provide a means to introduce additional evidence that the party knew was relevant before the court made its decision. *See Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996) (concluding that Rule 59 "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could or should have been presented . . . prior to the judgment"*)*; *In re Prince*, 85 F.3d at 324 ("Where a party is made aware that a particular issue will be relevant to its case but fails to produce readily available evidence pertaining to that issue, the party may not introduce the evidence to support a Rule 59(e) motion.").

5

The post-judgment reports the Walshes have now submitted are simply too late. At some point, the unfairness to Chez of giving the Walshes time to do what they should have done a long time ago requires that the Walshes' time must end. The court concludes that the Walshes' post-judgment expert opinions on the standard of care are not "new evidence" that justifies granting a Rule 59(e) motion.

2. The Court Made No Manifest Error In Law

The Walshes argue that the court committed a manifest error in law when it dismissed the case because it "misinterpreted precedential law as stated in *Chambers* [*v. Ingram*, 858 F.2d 351 (7th Cir. 1988)] and *Chamness* [*v. Odem*, 399 N.E.2d 238 (Ill. App. Ct. 1979)], [and] misinterpreted applicable Illinois law regarding plaintiffs' burden of proof . . . ." Pls.' Mot. for Reconsideration ¶ 1. According to the Walshes, the relevant case law holds that: (1) "An expert's testimony that a defendant's actions were negligent may be sufficient to establish the existence of a duty as well as a breach of that duty," *Chambers*, 858 F.2d at 356; and (2) "All that is necessary for the expert to establish is that there was a generally accepted medical standard of care which entailed treatment or performance of a procedure in a manner different than that provided by the defendant," *Chamness*, 399 N.E.2d at 246. The Walshes claim that under the principles established in these cases, their expert reports are sufficient. The court disagrees.

The court acknowledges that it does not cite *Chambers* or *Chamness* in its December 3, 2007 and December 4, 2007 orders; however, that does not mean that it overlooked the cases or misinterpreted the law. In fact, *Chambers* and *Chamness* use the very same burden of proof that the court articulated in its order: "To establish a claim of medical malpractice in Illinois, the

6

plaintiff must show: (1) *the applicable standard of care*; (2) that the defendant breached that standard of care and thus was negligent; and (3) that the breach was a proximate cause of the plaintiff's injury." *See Chambers*, 858 F.2d at 355 (citing *Purtill v. Hess*, 489 N.E.2d 867, 87 (Ill. 1986) (emphasis added)); *accord Chamness*, 399 N.E.2d at 245 (noting that "[o]ne element of a cause of action for medical malpractice is proof of the standard of care"). Thus, even under the cases on which the Walshes rely, a plaintiff must establish a standard of care in order to make a *prima facie* case. The Walshes did *not* establish a standard of care through their expert reports, which is why the court granted Chez's motion in limine and dismissed the case.

To argue otherwise, the Walshes rely on the section of *Chamness* that states, "All that is necessary for the expert to establish is that there was a generally accepted medical standard of care or skill which entailed treatment or performance of a procedure in a manner different than that provided by defendant," *Chamness*, 399 N.E.2d at 246, and argue that the expert need only state that there is a standard of care without specifying what the standard of care is. However, the Walshes quote the sentence out of context. It does not mean that the expert need do nothing more than say, essentially, that "what the defendant did is inconsistent with the standard of care." To the contrary, the main clause of this sentence clearly requires the plaintiff to establish a "generally accepted . . . standard of care." The court in *Chamness* found that plaintiff's expert established the relevant standard of care when he "testified that when confronted with a patient with [plaintiff's] symptoms, a chiropractor should first determine through neurological testing whether there was an actual neurological loss, and once such loss is confirmed he should do nothing or at least request a consulting opinion of one in the field of orthopedics or neurology."

*Id.* at 243. Thus, *Chamness* does not stand for the proposition that the conclusory statement that "what the defendant did was not right" will suffice as an articulation of the standard of care.

Nor, as the Walshes argue, is the basic requirement for an articulated standard of care changed by the Seventh Circuit's statement that "[a]n expert's testimony that a defendant's actions were negligent may be sufficient to establish the existence of a duty as well as the breach of that duty." *Chambers*, 858 F.2d at 356. Again, the Walshes quote the statement out of context. The defendant in *Chambers*[4] had argued that, in order to establish the applicable standard of care, the plaintiff must introduce standard of care testimony separate from testimony about deviations from the standard. *Id.* at 356. The court disagreed and used the language quoted to explain why. It went on to conclude, however, that:

> a fair reading of [the plaintiff's expert's] testimony is that it indicated that [the defendant psychologist] deviated from the applicable standard of care with respect to [the plaintiff's] treatment because she failed to obtain information, failed to record information, and failed to apprise [the psychiatrist] of [plaintiff's] condition. *Read in context, [the plaintiff's expert] testified that there was a generally accepted standard of care among professionals in the field of psychology to provide accurate information about the patient's mental condition.*

*Id.* at 357 (emphasis added). The court also detailed the testimony of the plaintiff's expert from which a jury could find that the defendant's actions had deviated from that standard of care:

> She (1) failed to conduct a thorough mental status examination at the initial interview; (2) failed to make a detailed report of the interview containing

---

[4]In *Chambers*, the plaintiff was a prison inmate who suffered seizures after being treated with a certain drug. 858 F.2d at 352, 354. The defendant was the on-site supervising psychologist in charge of the psychiatric unit of the prison in which the plaintiff resided. *Id.* at 352. She evaluated the inmates but was unable to prescribe drugs. *Id.* Therefore, she would report to a part-time psychiatrist who would prescribe any necessary drugs, sometimes without seeing the patient himself. *Id.* at 353.

8

impressions and bases for her diagnosis; (3) failed to report all information about suicidal tendencies to [the psychiatrist]; (4) failed to record all courses of treatment in the daily notes; and (5) failed to recognize when medications were inconsistent with recorded observations and pass this information on to [the psychiatrist].

*Id.* Thus, the Seventh Circuit found that the testimony of the plaintiff's expert established the applicable standard of care, namely to provide accurate information about the patient's condition to the psychiatrist, and detailed specific acts taken by the defendant psychologist that deviated from that standard of care.

This court, after reviewing the expert reports and allowing supplementation, concluded that the Walshes' expert testimony was insufficient to establish the relevant standard of care. Plaintiffs initially named two experts, James Tucker, M.D. and Ira Cheifetz, M.D. In their initial reports, the doctors gave the following opinions on the standard of care:

Tucker

I believe Jason Walsh did not receive the standard of care with regard to treatment with[5] and weaning from high dose steroids. . . . I can state with a reasonable degree of medical certainty that weaning from high dose steroids to twice a week pulse dosing is not the standard of care for pediatric patients.

Ex. D to Defs.' Mot. In Limine No. 10 (opinion of Dr. Tucker, dated February 24, 2005).

Cheifetz

[W]eaning the steroid therapy from greater than 2 mg/kg/day for seven weeks to twice weekly dosing is extremely fast.

Ex. E to Defs.' Mot. In Limine No. 10 (opinion of Dr. Cheifetz, dated October 5, 2005).

The steroid weaning employed by Dr. Chez was not acceptable and was not within the accepted standard of care.

---

[5]The treatment criticized by Dr. Tucker was "[t]he use of steroids to treat autism-like syndromes," an issue that is no longer part of this case.

9

Ex. E to Defs.' Mot. In Limine No. 10 (opinion of Dr. Cheifetz, dated June 27, 2006).

When Chez moved to bar the Walshes' experts from testifying for the reason, *inter alia*, that they failed to set forth a standard of care but "merely offered an impermissible bottom line conclusion," the court, over defendants' strenuous objection, gave the Walshes an opportunity to supplement their disclosures on the standard of care.  In response, Drs. Cheifetz and Tucker gave these opinions, dated September 12, 2007 and August 17, 2007 respectively :

Cheifetz

> The standard of care for all licensed physicians practicing medicine and prescribing corticosteroids with children is the same with regard to discontinuing the use of Prednisone, regardless of the physician's specialty and additional training. . . .  Because corticosteroids suppress a child's endogenous steroid production, the weaning of Prednisone after subacute or chronic usage must allow the child time to resume his/her own steroid production.
> 
> ***
> 
> Dr. Chez' office records indicate that Mrs. Walsh advised his office of the pneumonia and antibiotic treatment.  Prednisone in the same dosage was continued.  Two weeks later, while Jason was still recovering from his pneumonia, Dr. Chez negligently instructed Mrs. Walsh that daily Prednisone be discontinued and doses be given only on Tuesdays and Fridays. . . .  This negligent order on February 25, 2003, resulted in Prednisone being discontinued for two days . . . and then discontinued again for three days.  This protocol is not accepted in any recognized textbook, is negligent, and is not consistent with accepted practice in this circumstance. . . .
> 
> By order of Dr. Chez, Jason was deprived of Prednisone on March 1, Marcy 2, and March 3, 2003.  On or about March 1st, Mrs. Walsh contacted Dr. Chez' office to report that her child had a fever of 103°F or 104°F.  On March 3, 2003, Dr. Chez' office contacted Mrs. Walsh and negligently told her "No change for now..."  The standard of care required prescribing additional steroids for Jason.  Dr. Chez' failure to order immediate Prednisone to Jason was a breach in the standard of care and not consistent with which a reasonably careful physician would do in this circumstance.

Ex. 1 to Pls.' Reply in Support of Mot. for Reconsideration (opinion of Dr. Cheifetz, dated September 12, 2007).

Tucker

The standard of care for an unexplained fever in a child whose body is unable to manufacture stress levels of cortisol would be to have the child examined by a physician. In addition, if indicated by the physician's evaluation, consideration should be given to the administration of exogenous steroids as replacement for the stress levels of cortisol the adrenals were not producing.

Ex. 2 to Pls.' Reply in Support of Mot. for Reconsideration (opinion of Dr. Tucker, dated August 17, 2007).

The complaint alleged, and the Walshes' initial expert reports stated, that Dr. Chez's negligence inhered in the speed at which he reduced Jason Walsh's Prednisone: that weaning from the dosage he prescribed initially to twice weekly pulse dosing was too fast. *See, e.g.*, Compl. ¶ 24(h) (alleging that defendant was negligent "[i]n prescribing an abrupt wean from daily high-dose steroids to a twice-a-week pulse-dose, a schedule not recognized or accepted within the pediatric community"). What the experts did not say, and what the defendant's motion in limine no. 10 and the court's order at the pretrial conference required, was for the experts to disclose what weaning dose would have met the standard of care (or how Dr. Chez should have determined an appropriate weaning schedule).[6] What the Walshes came back with in response was an opinion of Dr. Cheifetz that the standard of care required an *increase* in steroid dose, and an opinion from Dr. Tucker that the standard of care required *examination* by a physician *with the consideration of prescribing additional steroids* if justified by the examination. Thus, rather than provide a standard of care for weaning a child from steroids, the experts opined that steroids should have been increased once the child exhibited a fever during

---

[6]It is important to point out that until the experts disclosed a standard of care, it was futile to try to determine whether they were qualified to opine about it.

11

weaning. This represented a dramatic change in plaintiffs' theory of the case, both in terms of treatment and the point in time at which the alleged negligence began, something predicted by neither the complaint nor the discovery that had taken place prior to the eve of trial. The Walshes did not, despite fair warning that it was required, disclose a standard of care for weaning a child from steroids, nor did they seek to amend the complaint, reopen discovery, or do anything to make clear that they were altering their theory of negligence and could not articulate a standard of care for the theory of negligence articulated in the complaint and in the initial expert reports. While the Walshes never requested permission to amend the complaint to change the theory of their case on the eve of trial, permission would not have been granted. To do so would have been extremely unfair and would have required that this case, in which discovery had long been completed, essentially begin again.

### III. CONCLUSION

The Walshes have neither presented newly-discovered evidence nor shown that the court committed a manifest error in law within the meaning of Rule 59(e). Therefore, the court denies plaintiffs' Rule 59(e) motion and denies plaintiffs' request for leave to supplement their Rule 26(a)(2) disclosures.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 22, 2008